*In re* D.L. *et al.*, Minors, Respondents (The People of the State of Illinois, Petitioner-Appellee, v. Danielle L. *et al.*, Respondents-Appellants).

First District (2nd Division)   No. 1—99—4146

Opinion filed November 13, 2001.—Rehearing denied November 20, 2001.

Rita A. Fry, Public Defender, of Chicago (Pamela Pfrang, Assistant Public Defender, of counsel), for appellants.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Nancy Grauer Kisicki, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Charles P. Golbert and Rhonda S. Love, of counsel), guardian *ad litem*.

JUSTICE CAHILL delivered the opinion of the court:

Respondents Danielle L. and Todd S. appeal an order finding them unfit parents and terminating their parental rights. We affirm.

An adjudication of wardship was entered on October 6, 1996, as to four minor boys, D.L., A.L., T.S. and A.C. Three of the boys are the sons of respondent-mother Danielle L. and Jesse C., now deceased. A fourth boy is the son of Danielle and respondent-father Todd L. The petitions for adjudication were filed by the State on February 2 and 7, 1996, alleging that the children were abused or neglected based on a lack of care and exposure to an injurious environment. The juvenile

court found that Danielle did not provide a medical card for one child and failed to enroll two other children in school, both respondents engaged in domestic violence, Danielle abused drugs, and Todd hit one of the children on the head, causing the child to hit a wall. The children were placed in the temporary custody of the Department of Children and Family Services (DCFS). An order of protection entered on December 12, 1996, allowed Danielle unsupervised visits from two to eight hours per week and ordered Danielle to participate in counseling and follow all recommendations. The case was then continued several times for a permanency plan hearing.

A permanency plan hearing was held on July 8, 1998. The DCFS caseworker and guardian *ad litem* recommended the goal of "substitute care." The public defender recommended that the children ultimately be returned home. The hearing officer recommended substitute care at the close of the hearing. The public defender filed a written objection to the hearing officer's recommendation.

The State filed a petition to terminate respondents' parental rights and appoint a guardian to consent to the adoption of the children on July 1, 1998. The petition alleged that Danielle was unfit under section 1(D) of the Adoption Act for failure to maintain a reasonable degree of interest, concern or responsibility, deserting the children in the three months preceding the termination petition, and for failing to make reasonable efforts within nine months of adjudication. 750 ILCS 50/1(D)(b), (D)(c), (D)(m) (West 1998). The petition alleged that Todd was unfit as to his son for failure to maintain a reasonable degree of interest, concern or responsibility and for failing to make reasonable efforts within nine months of adjudication. 750 ILCS 50/1(D)(b), (D)(m) (West 1998). The public guardian joined the State's petition.

A termination hearing was held on November 9, 1999. Todd was the State's first witness. Todd testified he was T.S.'s natural father. Todd said he was incarcerated on July 6, 1996, and has a February 6, 2001, expected release date.

Derrick Lindsay, a DCFS case manager, next testified for the State. Lindsay said he became involved in the case in June 1997 and that he was officially assigned the case on September 8, 1997. Lindsay explained that the case originally came into the DCFS system in December 1995, on allegations of a dirty house. The children were taken into DCFS custody in February 1996, when it was learned that the medical needs of one of the children were not being met. Underlying issues of domestic violence and drug abuse were also raised at this time.

Lindsay testified that the case record showed that, between October 1996 and July 1997, Danielle completed a parenting and drug

assessment but had not completed the recommended individual therapy. Lindsay performed a social assessment in September 1997, after officially being assigned the case, to determine what services Danielle still needed. Lindsay's assessment revealed an earlier overlooked anger-management problem. Lindsay then referred Danielle for counseling to address anger management and domestic violence. The provider required Danielle to undergo an additional assessment to better ascertain what services she required. Danielle underwent the additional assessment in November 1997, resulting in a recommendation for individual counseling, a psychiatric evaluation and supervised visits with the children. Danielle's supervised visits with A.C. were suspended in December 1997, after Danielle swore at him, causing the child to hit his head and bite himself.

Lindsay testified that Danielle's weekly supervised visits became sporadic in December 1997. Lindsay said that there were no supervised visits between April 1998 and July 1998. Lindsay also testified that Danielle failed to complete the services recommended by the latest evaluation. Therapy was discontinued by one provider because of Danielle's sporadic behavior. Therapy from another provider was delayed because Danielle was in jail for allegedly throwing hot grease in a man's face.

Lindsay referred Danielle to a parenting assessment team in July 1998. Services began in September 1998. Lindsay said that the only time Danielle demonstrated proper parenting skills was when the assessment team came to her home and videotaped her with the children. Lindsay said that Danielle knew she was being taped. Both Lindsay and the team agreed that the children would still be at risk for maltreatment despite Danielle's good behavior during the videotaped session.

Lindsay said that Danielle never completed counseling and never fully addressed her anger-management problem. Lindsay referred to an outburst in court where Danielle verbally assaulted her attorney, a sheriffs' deputy and the juvenile court judge. Lindsay also concluded that Danielle failed to address the underlying issues that gave rise to these proceedings, leaving her children at risk for maltreatment.

Lindsay testified that Todd was incarcerated when Lindsay became involved in the case. Lindsay said he contacted the warden and Todd's counselor. He told them that he wanted Todd to undergo a drug treatment program and psychological assessment. Lindsay was told that Todd had to ask for these services from his counselor. Lindsay understood this to mean that he could not order services for Todd. Todd did not ask for services and completed no services between October 1996 and July 1998. There was proof that Todd participated

in a drug treatment program, but not that he had completed it. The only visitation Todd had with his son was in court. No other visits were arranged. Lindsay said that Todd did not ask to see his son or have pictures sent.

Kathleen Pesek testified for the State without objection as a child welfare expert. Pesek was a member of the parenting assessment team that observed Danielle's interaction with the children in her home. Pesek testified that a parenting assessment included the parents seeing a psychiatrist, the parents and children seeing a psychologist, a social worker in the home, and a child development specialist to review all the records. Pesek said the assessment here was completed in January 1999. Pesek interviewed Danielle and concluded that she failed to "appreciate her children's needs" and did not understand the reasons she lost custody. Pesek said that, although Danielle had been in counseling since 1996, there has been no difference in her parenting ability. Pesek conceded on cross-examination that no further recommendations were made. Pesek also conceded that the videotaped observation was made after the goal for termination of parental rights had been set. Pesek admitted that there was only one such observation, which lasted about an hour.

The State then made a motion to amend the petition to include an allegation of unfitness under section 1(D)(r) of the Adoption Act against Todd. This section allows an unfitness finding when a parent is incarcerated at the time the petition for termination is filed, the parent had little or no contact with the child before incarceration, and the incarceration will prevent the parent from discharging parental responsibilities for more than two years after the filing of a termination petition. 750 ILCS 50/1(D)(r) (West 1998). The court allowed the amendment over Todd's objection. The State then rested. The public guardian also rested without presenting additional evidence. The respondents then presented their case.

Todd said that disciplinary problems caused his release date to be delayed from July 6, 2000, to February 6, 2001. Todd had been incarcerated since July 6, 1996. He said his only contact with his son during this time was in court through Lindsay, the DCFS caseworker. Todd said that Lindsay suggested he attend a drug program and be psychiatrically evaluated. Todd later denied that Lindsay told him he had to ask for counseling services. Todd said he volunteered for an 18-week drug program in prison because he felt he needed to do so for his son. Todd said he completed the program. A certificate of completion was refused on the State's objection. Todd admitted that he never visited his son outside of court and that such visits were discontinued when Lindsay suggested they created unhealthy memories for the

child. But Todd said that he wanted to continue visiting with his son. While in prison, Todd received a GED and received psychiatric counseling. Todd did not present evidence on the progress of this counseling. Todd said he would have participated in a parenting class if such a program had been offered in prison.

Danielle testified that she shared an apartment with her sister, brother and father. Danielle testified that Franklin Joe was the first caseworker assigned to the case when she lost custody of her children. Joe was her caseworker until September 1998 when Lindsay was officially assigned the case. Danielle said that Joe first referred her to a parenting class, which she completed in December 1996. Danielle also completed a psychological evaluation. Danielle denied that Joe recommended additional services.

Danielle claimed that, while Joe was her caseworker, she had daily unsupervised visits with her children, who were in her aunt's custody. Danielle said the daily visits ended in 1997 when she and her aunt had a disagreement. Lindsay arranged later visits to take place at a center in the presence of a DCFS worker. These visits took place every Monday for an hour and a half. Danielle also claimed to have extended unsupervised visits on weekends, the last one being on June 3, 1999. Danielle then said she had unsupervised visits with the children in July and August 1999. When confronted with this discrepancy, Danielle insisted both statements were true and that her father pushed her aunt to allow the later visits. Danielle admitted that Lindsay told her he would arrange visitation if disagreements with her aunt continued. Danielle claimed she called Lindsay to arrange such visits, but he never called her back. Danielle also admitted that she had an anger-management problem.

The court, after hearing closing arguments, found that both respondents were unfit parents based on the allegations of the petition as amended. The court said both parents' testimony was unreliable and self-serving. Lindsay's and Pesek's testimony was found competent and reliable. The court then addressed the children's best interests.

Lindsay testified for the State. Lindsay said the children had been living with their great aunt for three years and had bonded with her. Lindsay said the home was safe and preadoptive. The children's special needs were being met both at home and at school. All four children told Lindsay that they wanted to be adopted. Lindsay said the boys needed permanency and their best interest would be served by terminating both respondents' parental rights.

Rose Marie Loupe, the children's maternal grandmother, was called by the public defender. Loupe testified that she stayed with the children and their great aunt from May to July 1998. Loupe said re-

spondent mother visited almost every day during this time. Loupe admitted that Danielle had an anger-management problem but said the children's interests would not be served by terminating their mother's rights.

Todd testified that he could possibly be released before February 2001, but also admitted that he had received at least nine disciplinary "tickets," one of which could affect his release date. Todd testified that he planned to live with Danielle and his son upon his release.

Danielle testified that she was currently enrolled in a 90-day anger-management program. Danielle said she would not leave therapy until released by her counselor. Danielle acknowledged that her children had special needs. Danielle said that she could meet those needs once she put her life back together.

The court ruled, without hearing argument, that the children's best interests are best served by terminating respondents' parental rights. The court said its ruling considered evidence taken at the best interests hearing and at the earlier unfitness hearing. The court noted that since 1996, the parents had made little progress in putting their lives back on track. The court concluded that the children's need for permanency demanded that parental rights be terminated and the children be adopted.

Respondents timely appeal the court's unfitness finding and decision to terminate parental rights.

Respondents' first argument that the State failed to prove unfitness by clear and convincing evidence is unpersuasive.

■ Respondents challenge all the grounds on which the trial court determined them to be unfit except the finding that both failed to maintain a reasonable degree of interest in, concern for or responsibility over the children. 750 ILCS 50/1(D)(b) (West 1998). The omission concedes that respondents are unfit on the unchallenged basis and makes it unnecessary to address respondents' additional arguments. See *In re D.L.*, 191 Ill. 2d 1, 8, 727 N.E.2d 990 (2000) (challenge to only one of several grounds supporting unfitness finding rendered appeal moot); *In re M.J.*, 314 Ill. App. 3d 649, 655, 732 N.E.2d 790 (2000) (sufficient evidence of one statutory ground obviates the need to consider other grounds of unfitness). Evidence of one statutory ground is sufficient to support an unfitness finding, even if evidence is insufficient to support other grounds alleged. *In re C.L.T.*, 302 Ill. App. 3d 770, 772, 706 N.E.2d 123 (1999). This concession aside, the additional challenged grounds of unfitness are supported by the manifest weight of the evidence.

Danielle claims that because there was evidence that she visited her children, she should not have been found unfit based on desertion.

The evidence to which Danielle refers is her vague, contradictory and self-serving testimony about her visits. This testimony was refuted by Lindsay, whose unrebutted testimony established that Danielle had no visits with her children between April and July 1998—the relevant period for determining desertion. 750 ILCS 50/1(D)(c) (West 1998). The trial court found Lindsay more credible. Determination of parental unfitness involves factual findings and credibility assessments that the trial court is in the best position to make. *In re M.J.*, 314 Ill. App. 3d at 655. We defer to those findings here and will not reweigh evidence or reassess witness credibility on appeal. *In re C.L.T.*, 302 Ill. App. 3d at 772.

Both respondents next complain that an unfitness finding based on a failure to make reasonable efforts to correct the conditions that precipitated removal of the children was not proven by clear and convincing evidence. Respondents claim that the evidence submitted was outside the relevant nine-month period and was inadmissible hearsay.

A parent may be found unfit if he or she fails to make reasonable progress toward the return of the child within nine months of an adjudication of dependency. 750 ILCS 50/1(D)(m) (West 1998). The State agrees that the nine-month period here began on October 2, 1996, and ended on July 2, 1997. Respondents claim that, because Lindsay testified that he did not become the case manager until September 8, 1997, his testimony was irrelevant and inadmissable hearsay. Respondents overlook that Lindsay testified that, although he was not officially assigned the case until September 1997, he became actively involved in the case in June 1997. Respondents fail to explain how Lindsay's testimony about events after June 1997 is irrelevant or hearsay. We believe that Lindsay's observations during the ninth and final month of the statutory window would not only be relevant, but crucial in determining whether respondents made a reasonable effort toward the return of the children. It also bears noting that respondents failed to make a hearsay objection to Lindsay's testimony at the hearing and actually elicited part of the testimony they now claim is irrelevant, waiving the issue on appeal.

Todd also challenges the trial court's unfitness findings based on desertion and incarceration. The State concedes that Todd should not have been found unfit based on either desertion or incarceration. The State explains that the petition only alleged desertion as to Danielle. The State also says that the evidence failed to establish that, before his incarceration, Todd had little or no contact with his son or provided no support as the statute requires. 750 ILCS 50/1(D)(r) (West 1998).

The public guardian disagrees with the State's concession on the

desertion finding and contends that Todd's desertion is supported by the manifest weight of the evidence. The public guardian also contends that Todd waived this issue by failing to object to the desertion finding at the hearing. We agree with the public guardian that the issue is waived.

Waiver aside, Todd's unfitness based on desertion is supported by the manifest weight of the evidence. The record shows that, except for the first five months after the dependency adjudication, Todd was in prison during the pendency of the case. Lindsay testified that Todd did not send his son gifts, letters, pictures, or ask that his son be given pictures of him while he was incarcerated. Todd visited his son only three times, each visit taking place during a scheduled court appearance. Lindsay said that Todd did not ask for other arrangements to be made to facilitate more regular or appropriate visitation. Lindsay's testimony contradicted Todd's testimony that he sent gifts, letters and cards to his son through Danielle. The trial court had the opportunity to assess witness demeanor and credibility and found Lindsay more credible. We will not disturb this assessment on appeal. *In re C.L.T.*, 302 Ill. App. 3d at 772.

Parental unfitness must be proved by clear and convincing evidence. *In re Pronger*, 118 Ill. 2d 512, 526, 517 N.E.2d 1076 (1987). We will not reverse an unfitness finding unless it is against the manifest weight of the evidence. *In re C.L.T.*, 302 Ill. App. 3d at 772. A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *In re J.P.*, 261 Ill. App. 3d 165, 174, 633 N.E.2d 27 (1994). Putting aside that the unchallenged ground of unfitness is sufficient reason for us to affirm, the evidence here shows that the State carried its burden as to the additional grounds alleged in the petition.

Respondents alternatively contend that, even if unfitness was proven by clear and convincing evidence, the trial court erred in terminating their parental rights at the close of the best interests hearing either because the (1) State is required to establish a child's best interests by clear and convincing evidence or (2) trial court's decision to terminate respondents' parental rights was based on improper evidence.

■ Respondents' claim that due process requires a clear and convincing burden of proof at a best interests hearing overlooks well-established case law holding that, once parental unfitness is proved by clear and convincing evidence, the decision to terminate parental rights lies within the sound discretion of the trial court. *In re C.M.*, 319 Ill. App. 3d 344, 360, 744 N.E.2d 916 (2001); *In re Sheltanya S.*, 309 Ill. App. 3d 941, 955, 723 N.E.2d 744 (1999); *In re D.J.S.*, 308 Ill.

App. 3d 291, 295, 719 N.E.2d 1168 (1999); *In re J.J.*, 307 Ill. App. 3d 71, 76, 716 N.E.2d 846 (1999). Respondents also misread *Santosky v. Kramer*, 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982), the case cited to support their higher burden of proof argument.

In *Santosky*, the Supreme Court held that a clear and convincing burden of proof applied at the fact-finding or unfitness stage of proceedings because both the parent and child share a vital interest in continuing their natural relationship. But the Court held that, once unfitness was proved, the interests of the parent and child diverged, triggering a lesser burden of proof. *Santosky*, 455 U.S. at 769, 71 L. Ed. 2d at 617, 102 S. Ct. at 1403. *Santosky* did not hold, as respondents argue, that the State prove that termination of parental rights is in the best interests of the child by clear and convincing evidence. Respondents' unfitness here was proved by clear and convincing evidence. The decision of what was in the children's best interests was properly left to the trial court's discretion.

■ Respondents' alternative contention is also unpersuasive. Respondents claim that the trial court "improperly intermingled the evidence from [the unfitness] proceeding" in deciding to terminate respondents' parental rights, rendering the decision against the manifest weight of the evidence. But respondents fail to cite a single case to support their claim that, in deciding whether to terminate parental rights, a trial court may not consider evidence taken at an earlier unfitness hearing in conjunction with evidence taken at a subsequent best interests hearing. This argument undermines the purpose of a separate best interests hearing.

The best interests of a child should not be treated lightly. *In re A.P.*, 277 Ill. App. 3d 592, 599, 660 N.E.2d 1006 (1996). The purpose of a mandatory separate hearing on a child's best interests is to ensure proper focus on those interests, consideration of which is not relevant unless and until a parent is found unfit. *In re A.P.*, 277 Ill. App. 3d at 600; *In re Adoption of Syck*, 138 Ill. 2d 255, 276, 562 N.E.2d 1174 (1990) (a court may not consider a child's best interests when determining unfitness). It follows that, since the focus of a best interests hearing is to determine whether a child is better served by adoption, evidence of a natural parent's earlier proven unfitness is a relevant, if not crucial, consideration. It is difficult to imagine how a required best interests hearing could proceed otherwise. Accepting respondents' argument would be tantamount to requiring trial courts to wear blinders and consider a child's best interests in a factual vacuum, ultimately failing the child whose interests are at stake. The decision to terminate respondents' parental rights was one of discretion. We find no abuse of that discretion here.

The judgment of the trial court is affirmed.

Affirmed.

BURKE, P.J., and McBRIDE, J., concur.